DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Futures, Inc. | )  ASBCA No. 61566 |
| | ) |
| Under Contract No. 000000-00-0-0000 | ) |

APPEARANCE FOR THE APPELLANT:          Jason P. Matechak, Esq.
                                         Impresa Legal Group
                                         Arlington, VA


APPEARANCES FOR THE GOVERNMENT:    Dana J. Chase, Esq.
                                         Army Chief Trial Attorney
                                       LTC Sean B. Zehtab, JA
                                       John C. Degnan, Esq.
                                         Trial Attorneys


OPINION BY ADMINISTRATIVE JUDGE PROUTY


The appeal before us involves appellant, Futures, Inc. (Futures), attempting to obtain the effective award of a government contract for which it was formally rejected and to retroactively apply the never-awarded contract to cover services it voluntarily provided as a subcontractor under the auspices of other contracts in the hope or expectation of obtaining the later contract. As explained in far greater detail below, the Office of the Secretary of Defense - Reserve Affairs (OSD-RA) had engaged a private contractor and its successor to operate a website, built and maintained by their subcontractor, Futures, that assisted military reservists find civilian employment. Shortly after the first contract was executed, the website was opened to all active duty soldiers in the military, including the United States Army (the Army) without any change to the contract or objection by Futures or either prime contractor. Futures, in fact, was an advocate of extending the reach of the website and attended many meetings and events to promote its widespread use. The Army subsequently sought to award a sole-source contract to Futures to continue to run the website, but as the prime contractor, rather than as a subcontractor; to formally make it available to all soldiers within the Army; and to add far greater functionality to the site. Though many high-ranking Army officers wanted such a contract to be awarded to Futures – and made that ambition clear to Futures as early as a December 2011 meeting at the Pentagon – Army efforts to make a formal award to Futures in late 2012 through 2014 foundered, and the attempt was ultimately ended because it was decided to use a different service government-wide. During all this time, Futures explicitly recognized that it had no contract with the Army and it never submitted an invoice to the Army for its services. Now, however, Futures seeks to be paid for the support that it provided

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*gratis* during its efforts to obtain the proposed contract.  At the end of the day, none of the theories that Futures propounds to support its reimbursement have the evidentiary support or legal bases necessary to create a contract with the Army or otherwise entitle it to payment.

## FINDINGS OF FACT

I.  Preliminaries:  Futures Creates its Pipeline System and Begins to use it with the Military

Futures was created by its chief executive officer (CEO), Mr. Geoff Cramer, in 2005 after a nonprofit that he had previously run, Futures For Kids, lost its funding (tr. 1/44).  Futures, with the help of other corporate entities, created software, known as "Pipeline," which Mr. Cramer characterized as "a navigation tool [that] breaks down language barriers" (tr. 1/45-46).  In its original iteration, it helped connect people to jobs for which they were suited; in its application to the military, it essentially translated military positions and skillsets into their civilian counterparts and matched them with companies seeking to hire employees (tr. 1/46-51; 1/56-58).  Mr. Cramer asserted in his testimony that it was not merely a "portal," which he stated could be put together in a weekend, but was a cloud-based application that had taken a decade to create (tr. 1/88).

At some point after its formation, Futures worked with the Army around Fort Bragg, NC to help transition separating soldiers into job opportunities in the local area (tr. 1/48-49), presumably using its Pipeline software.  Futures subsequently (apparently sometime during the 2008-2009 timeframe) got involved in helping "Wounded Warriors" in the Fort Bragg area find civilian work (tr. 1/49-54).  Though it did not seek to get paid for the Wounded Warrior work (*see* tr. 1/51-52), this work did begin a relationship between Futures and the Army, including a meeting between Mr. Cramer and then-Brigadier General (BG) Gary Cheek, in 2010 (tr. 1/54-55).  According to Mr. Cramer, his meeting with BG Cheek led to a meeting shortly thereafter in Washington, DC with Major General (MG)[1] Rick Mustion, then Adjutant General[2] of the Army and another general, Jeffrey Horn (tr. 1/60-61).  After that meeting, the Army declined to pursue matters any further due to cost (tr. 1/61).

---

[1] We suspect that MG Mustion would have been a Brigadier General at the time that he was Adjutant General, but we have not seen his rank at the time reflected anywhere in the record.  We refer to him as MG here because, as will be seen, he was later involved in this matter when he was no longer the Adjutant General and had attained two-star rank.

[2] The Adjutant General is responsible for personnel matters for the Army (tr. 3/214 (Adjutant General Corps is the Army personnel community)).

2

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

According to Mr. Cramer, approximately two years later (which would be the 2011-2012 timeframe, but we believe it to have been some time before late September 2011 to be consistent with matters discussed immediately below), the Army approached Futures to ask for help in transitioning soldiers. Apparently, this change in heart came about because the Army was downsizing and finding that its unemployment insurance obligations were substantial for those soldiers who did not find immediate work upon discharge (tr. 1/61-62).

## II. The Initial Step: The Contracts for Support of the H2H.jobs Website

At some point, apparently prior to September 28, 2011, OSD-RA approached Futures and informed it that it was interested in using its Pipeline technology as a job-seeking solution for the entire reserve component (tr. 1/113-14). Though Mr. Cramer did not directly identify who at OSD-RA approached him, his testimony suggests that it was Mr. Ron Young (*see* tr. 1/120; *see also* R4, tab 38 ¶ 7), who was the Director of the OSD-RA Family and Employer Programs and Policy office (R4, tab 38 ¶ 3). Rather than accomplish this through a direct contract with Futures, on September 28, 2011, OSD-RA awarded a contract to Hooah LLC (Hooah) [3] to provide the website that would help military reservists obtain civilian employment. [4] Futures was the nominal subcontractor to Hooah and ran this site, the H2H.jobs [5] site, through its Pipeline technology. (R4, tab 1 at 1, 7-11; Joint Stip. ¶ 3) The URL for the website, H2H.jobs, was owned and controlled by OSD-RA (tr. 1/222-23). The period of performance for this contract (the Hooah contract) was one year (R4, tab 1 at 3).

## III. After the Award of the Hooah Contract by OSD-RA, the Active Duty Army and Futures Agree to Opening the H2H.jobs Portal for use by Active Duty Soldiers and Actively Encouraging its Widespread use

As discussed in this section, Futures performed more work than was required by either the Hooah contract or a successor contract with TASA Information

---

[3] The record does not directly tell us why OSD-RA chose to obtain the Pipeline services from Hooah rather than directly from Futures. Hooah was an "8(a)" contractor, however, and Futures was not (tr.1/115; 1/119). We take judicial notice of the fact that contracting through the 8(a) program can significantly streamline the contract award process, subject to certain limitations.

[4] The entity that effected the award was the Defense Human Resources Activity (DHRA) (R4, tab 1 at 1), but the parties have recognized in their Joint Stipulation of Undisputed Facts, that the DHRA-awarded contracts were effectively awarded on behalf of OSD-RA (*see, e.g.,* Joint Stipulation of Undisputed Fact (Joint Stip.) ¶¶ 3, 4).

[5] "H2H" is short for "Heroes to Hired" (tr. 1/188; Joint Stip. ¶ 5).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Technology, Inc. (TASA). It did this intentionally and with the knowledge of the Army, with both parties hoping that it would inure to their mutual benefit.

     A.   <u>H2H.jobs is Opened up to the Active Duty Army</u>

The evidence before us supports our concluding that OSD-RA, the Army, the two prime contractors, and Futures supported a no-cost expansion of access to the H2H.jobs website to include not only reservists, but active duty members of the military.

Mr. Walter Herd, who was the National Director for the Army's Transition Assistance Program (TAP) and started that job sometime in late 2010 or early 2011 (*see* tr. 8/6), testified about meeting with Mr. Cramer at Fort Bragg shortly after taking the TAP position (tr. 8/14-19). This would have been some time in 2011 or 2012[6] (tr. 8/14; *see also* tr. 1/112). During this meeting, Mr. Cramer demonstrated the H2H.jobs site to Mr. Herd. Mr. Herd testified that Cramer was "adamant" that he wanted it to be free for everybody and that it was at no cost to the Army and that it was, in fact, in everybody's interest that more soldiers use it so that more companies would be incentivized to utilize the platform. (Tr. 8/15-16)

This version of events was contested by Mr. Cramer, who testified that he was not, in fact, "adamant" to Mr. Herd that he wanted the website to be free to all service members, active and reserve, at this meeting because the OSD-RA contract did not yet exist (tr. 1/120). Mr. Cramer did not, however, directly testify that he had never said such a thing to Mr. Herd. Later in his testimony, Mr. Cramer testified that Futures was instructed by OSD-RA not to "gate" the system, meaning that it was to allow all service members, not just reservists, to have access to it (tr. 1/262). When he was cross-examined on the subject, however, he could not identify who made that direction (tr. 2/5).

---

[6] Mr. Cramer testified that his first meeting with Mr. Herd would have been at an October 2010 meeting in Washington, DC (tr.1/112), which is consistent with the parties' Joint Stipulation of Undisputed Facts (*see* Joint Stip. ¶ 9). The parties' Joint Stipulation of Undisputed Facts also provides that they met on December 16, 2010, at Fort Knox, KY (*id*.). Since the meeting, as Mr. Herd described it, involved a demonstration of the H2H.jobs site and as discussion of the OSD-RA contract, and as Mr. Cramer testified, the site was not running in October 2010 and the OSD-RA contract was not in existence at that time (tr. 1/112-13), we find that the meeting at Fort Bragg that we are discussing here most likely took place some time in late 2011. Moreover, we find it plausible that the vagaries of memory may have been such that a discussion between the two happened in late 2011, but that it was not at Fort Bragg.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Mr. Cramer's allegations about directives from OSD-RA, in turn, was contradicted by Mr. Dan Allen, who ran the H2H program for OSD-RA at the relevant time (tr. 7/94). Mr. Allen testified that he had been forbidden by his superiors from using the OSD-RA contracts to provide services for active duty members and had so informed Mr. Cramer (tr. 7/98-101). According to Mr. Allen, Mr. Cramer was reluctant to limit the access to H2H.jobs because it would let down the active duty service members who needed help (tr. 7/102-03). Indeed, Mr. Cramer agreed with this version of events in his own testimony, except that he emphasized that he believed he had a deal with the Army that he was obligated to honor (tr. 1/232-33). Mr. Allen further testified that he had raised the issue on subsequent occasions, in particular, seeking the removal of the "active duty" button from the website (tr. 7/102-03). Mr. Allen, however, also testified that at a later time, he became aware that Futures was providing free services to active duty members, not under any contract, but as a "proof of concept" to obtain more work from the Army (tr. 7/105-07) and that he had been encouraged by his superiors to stay out of Futures' way as it attempted to obtain business from the Army for active duty soldiers (tr. 7/108-09). From the testimony before us summarized above, it appears that OSD-RA made some efforts to keep the provision of services to active duty members from being characterized as part of the Hooah and TASA contracts, but, having made the point, did not go out of its way to prevent the provision of these services voluntarily by Futures, which both sides saw as serving their interests.

Mr. Herd and Mr. Allen were not the only witnesses to testify that Mr. Cramer had encouraged the use of the OSD-RA-provided H2H.jobs by the active duty force. Lieutenant General (LTG)[7] Jason Evans, who was the Army Adjutant General from July 2011 through March 2013 (tr. 5/110), testified that he was at several meetings in which both OSD-RA officials and Mr. Cramer, himself, encouraged the use of the H2H.job site by active duty members (tr. 5/157-59). LTG Evans testified similarly to Mr. Herd, that part of the motivation for opening up H2H.jobs to more people (*i.e.*, active duty members) was the notion that it would provide better results (tr. 5/157). LTG Evans testified that, in general, he had viewed the use of the website by active duty members to be free of additional charge and that subsequent contract actions on the active duty side were aimed at getting things not already provided, such as metrics of success (tr. 5/135-36).

---

[7] At the time he was Adjutant General, LTG Evans was a Colonel and then promoted to Brigadier General (*see* R4, tab 59 at 1 (COL) and R4, tab 103 (BG)). For consistency, we will refer to him as LTG, the rank he held when he testified before us.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The clanging absence in the record of contemporaneous complaint from Futures about the matter[8], when it was clear that the website was being made available to all, combined with the plausibility of Mr. Herd's testimony as supported by LTG Evans's (i.e., it would make sense that H2H.jobs with more users would be more appealing to businesses, and this does not seem to be the kind of rationale that Mr. Herd would have fabricated out of whole cloth) give us cause to believe Mr. Herd's version of events is more likely than not accurate. We hasten to note that we make this judgment without needing to conclude that Mr. Cramer made an intentional misrepresentation in his testimony because it is not at all unlikely that Mr. Cramer was correct when he stated that he had early meetings with Mr. Herd in 2010 in which universal access to the portal was not discussed.

Further supporting our conclusion in favor of Mr. Herd's version of events is the fact that we have observed nowhere in the record any complaint from the erstwhile prime contractors (Hooah or TASA) about the expansion of access of the H2H.jobs website to active duty members.[9] To the contrary, the record includes an undated document from TASA in which it boasts of its dealings with OSD-RA in which it provided access to the H2H.jobs portal to "employers and veterans at no cost" (R4, tab 57 at 1; *see also* Joint Stip. ¶ 27 (recognizing it to be a TASA document)).

We add an important note for context, which helps explain why the notion of opening up the H2H.job site to active duty members was not as significant a change as it might seem and why Army leadership did not perceive it to radically alter the requirements of the OSD-RA contracts: the vast majority of active duty soldiers transitioning from the Army to civilian life joined the reserves. The reason for this is not solely patriotism, but that the typical Army enlistment contract included a requirement that active duty be followed by a set period of reserve duty. There was testimony at the hearing that 85% of soldiers leaving active service joined the reserve component. (Tr. 8/8) Of course, as reservists, they would have had access to OSD-RA programs, like the Hooah and TASA contracts. Moreover, and very importantly, those soldiers who were only on active duty and would not become reservists did not (as will be noted later in this section) have access to the same suite of services provided by the Hooah and TASA contracts to reservists, further

---

[8] Not only has Futures failed to provide any evidence of complaint, but the cognizant contracting officer testified affirmatively that she had no recollection of such a complaint (tr. 7/70-71).

[9] Futures might argue that it did not complain because (as discussed below), by the time of the site's widespread use, Futures thought it had a contract with the Army to cover active duty use. But this would not explain the silence of the prime contractors (even if Futures did the majority of the work) nor would it explain silence lasting over several years during which no invoice was submitted nor payment made.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

diminishing the relative impact on Futures of its opening the H2H portal to the active duty Army.

B. The Army Internally Decides to Pursue a Single Employment Portal for Veterans – the one run by Futures – and Advocates for that Solution Government-Wide

At about the time that Mr. Cramer was urging Mr. Herd to make the portal available, free of charge, to all, outside events were making the broad availability of the portal of greater importance to the Army. This began, at least symbolically, on November 21, 2001, when President Obama signed Public Law 112-56, the Veterans Opportunity to Work (VOW) to Hire Heroes Act of 2011 (Joint Stip. ¶ 14).

On November 22, 2011, then-BG Barrye Price[10], who had recently met Mr. Cramer and been favorably impressed with the H2H.jobs platform (*see* tr. 6/142-45), asked Mr. Cramer to send information about navigating Pipeline to him so that the Army Vice Chief of Staff (General (GEN) Chiarelli) could play with it over Thanksgiving (R4, tab 46 at 1-2). Later in the same email string, BG Price invited Mr. Cramer to attend the Army "Transition Summit" to be held at the Pentagon on December 5 and 6, 2011, so that he could demonstrate to the attendees how the Pipeline system worked (*id*. at 4; *see also* tr.8/48-49). Mr. Cramer agreed and was placed on the agenda to make his presentation on the afternoon of December 5, 2011 (R4, tab 49 at 1; *see also* R4, tab 50 at 3 (slide identifying Cramer as the person to do it)).

As will be discussed below, according to Mr. Cramer, this was the meeting in which Futures was awarded the contract to provide support for active duty members for which it seeks recovery today (tr. 1/245). We read it differently. This was the meeting where the bureaucratic lines were drawn between the Army and other federal agencies with Pipeline/H2H as the alternative that the Army preferred as an employment portal, but no contract award was actually made. We draw these conclusions based in large part upon Mr. Cramer's own testimony.

Mr. Cramer testified that during the meeting, the attendees discussed how they were going to implement the VOW Act. Representatives from the Department of Veterans Affairs (VA) and Department of Labor (DOL) proposed that their two agencies handle matters on behalf of the Army and recommended that transitioning soldiers be essentially sent to them. (Tr. 1/130-31) It is fair to say that the Army did

---

[10] BG Price, at the time, was Director of Human Resources Policy in the G-1 section (tr. 6/137). We take judicial notice that the G-1, is the Deputy Chief of Staff for Personnel (*see also* tr. 3/147 (G-1 is "the chief people officer")) and that the Adjutant General reports to him or her.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

not like this approach. LTG Thomas Bostick, the Army G-1 at the time (*see* Joint Stip. ¶ 24), told the attendees that the Army did not concur with the VA/DOL proposal and that it wished to follow a different approach (tr. 1/131). A little later, GEN Chiarelli, elaborated that the Army had evaluated the solutions proposed by those agencies and that they did not work; however, (as Mr. Cramer testified), "he told them that the Army had selected H2H and Futures to provide the universal transition solution for soldiers." After that surprising[11] statement by the General, Mr. Cramer demonstrated H2H to all persons present. (Tr. 1/132)

After the demonstration, GEN Chiarelli re-iterated his view that he was responsible for soldiers until they separated from the Army, and that the VA and DOL would not be involved with them until that point. The VA and DOL representatives were apparently still surprised at the turn that things had taken that day, and the VA representative (Mr. Gingrich, the chief of staff to the Secretary of Veterans Affairs) proposed that the VA perform its own evaluation of the Futures technology compared to the VA's National Resources Directory. GEN Chiarelli responded by stating that he liked the idea of "a good Coke-Pepsi test" even if, as far as he was concerned, it had already been done and the Army solution of Futures was the way to go until the VA and DOL "[got their act] together." (Tr. 1/133-34)

We will return to GEN Chiarelli's version of "the Pepsi challenge" shortly. In the meantime, Mr. Cramer and LTG Bostick were excused from the meeting during which time LTG Bostick told Mr. Cramer what a good job he had done. According to Mr. Cramer, LTG Bostick further explained, in the context of GEN Chiarelli's announcement during the meeting that Futures had been selected to perform services for the Army, "that his office would handle the contracting and the paperwork, that they would expedite everything out of his office." (Tr. 1/135) Mr. Cramer testified that this all came as a surprise to him because he had thought he was going to the meeting to perform a demonstration, rather than get awarded a contract. Indeed, he ultimately conceded that he did not believe a contract was actually finalized in this meeting because such things as cost and time of performance were not discussed. (Tr. 1/245-47)

Mr. Cramer would later testify that he had subsequently set forth the cost to LTG Bostick in "round numbers" of "approximately $8 million a year" (tr. 2/12). This discussion, though, was not in writing, and Mr. Cramer described it as "roughly" that amount (tr. 2/13). Moreover, when he discussed the $8 million figure in his testimony as something the Futures had "always told the Army," the breakdown of upfront costs and monthly maintenance fees (*see* tr. 1/142) looks very much like the formal proposal

---

[11] The parties have pointed to no evidence, written or testimonial, that GEN Chiarelli had shared this determination to use H2H and Futures prior to this meeting.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

that was submitted near the end of 2012 that we will discuss below and which included substantial upgrades compared to what was provided by piggybacking onto the OSD-RA Hooah contract (*see* discussion in Section V. A., below). Except for unrelated job fairs to be discussed further below, no figure, much less, the $8 million one, is to be found in any writing before the proposals in so-called "white papers," also discussed below, which came in late October 2012. Nor has anybody but Mr. Cramer testified about it. Putting this all together, we are skeptical that a firm $8 million cost figure was set forth by Mr. Cramer in late December 2011 or in 2012 before late October and find, more probably than not, that it was not.

Adding to our skepticism about an oral contract being awarded by the Army in this time frame, we have no testimony from LTG Bostick in this matter nor from GEN Chiarelli in support of such a finding. LTG Evans, who was present during Mr. Cramer's presentation, testified that he heard no offer of a contract to Mr. Cramer at that time, though he did not purport to be present with Mr. Cramer and LTG Bostick during the time that LTG Bostick purportedly promised the contract to Futures. Moreover, according to LTG Evans, neither BG Price nor LTG Bostick ever told him that the Army had contracted with Futures and nothing he observed in the transition summit meeting gave him cause to believe that such a contract had been promised or awarded to Futures. (Tr. 5/160-62) Nobody at the transition summit was a contracting officer (tr. 1/246). Moreover, there was no evidence presented, whatsoever, that any immediate action was taken by the Army on this "contract award." Futures never once in the course of two years submitted an invoice to the Army (tr. 1/220).[12] Thus, though we do not doubt that Army leadership was enthusiastic about the H2H.jobs portal at the time of the December 5-6, 2011 summit, we view GEN Chiarelli's announcement of its "selection" by the Army as premature – perhaps posturing to forestall the imposition of the VA/DOL solution. In fact, in a near contemporaneous email sent on December 10, 2011, Mr. Cramer recognized just how contingent everything truly was, voicing his concern that the "bakeoff" would be a "trap" because "VA would do everything in their power to crush and discredit us to be the national portal" (R4, tab 53 at 2).

Our interpretation of the contingent nature of the Army's decision making is reflected in a follow-up briefing to GEN Chiarelli from COL Mason of Army G-1 on the afternoon of December 22, 2011. Present at this briefing were the VA Chief of Staff and a representative from the DOL. (R4, tab 52 at 1) The briefing slides state that the DOD-VA task force was still "reviewing 3 applications for **single application**

---

[12] Futures asserts in its post-hearing brief that it wanted to get paid and that it said so to the Army several times (app. br. at 37-38). But expressing a desire for money – which is the point of seeking a contract award – is not the same as submitting a specific request for payment under an existing contract, which never happened here.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

**(portal) for employment:** Veterans Job Bank (VA), My Next Move (DOL), and H2H (OSD-RA/Army). **Voice of the Soldier assessment favors H2H which best enables outreach component proof of concept. TF** [task force] **review ongoing.**"[13] (*Id*. at 4) (boldface type as in original) This particular slide added in its next bullet point that, "Army prepared to leverage OSD-RA-H2H application to connect Soldiers with private industry; will work parallel/bridge with TF solution" (*id*.). A later slide referred to "Hero 2 Hired connection to private industry jobs" as a component of the unemployment compensation solution (*id*. at 7), while the slide after that, discussing the element of the transition, indicated one task (apparently to come) being: "Select the application to serve as the primary location Soldiers and Veterans can connect to potential employers 24/7 worldwide" (*id*. at 8). The final slide in this presentation, entitled "Way Ahead" included a task labelled "Single Application (Portal) for Employment Implementation Plan." The "lead" for this task was the Task Force (not the Army) and the status of the task was stated as "Army functional requirements submitted. TF to determine milestones." (*Id*. at 12) In total, these slides made a few weeks after the December 5 and 6 meetings, are consistent with a desire to use Futures by the Army, but no finality and certainly nothing resembling a firm agreement upon terms or a meeting of the minds.

These slides also show that the "Pepsi challenge" was about a survey of which portal the soldiers liked better, not a formal competition where potential service providers were given an opportunity to compete for a contract, prices and other considerations were considered, and a contract award made (R4, tab 52 at 10). A document in the Rule 4 File entitled "Coke-Pepsi Survey Results" confirms this, inasmuch as its 55 pages reflect head-to-head comparisons of H2H and another portal from the individual user's perspective, but nothing about costs or programmatic issues (R4, tab 51).

C.  H2H is Adopted as an Interim Solution for use by the Army

Though the VA and DOL appear to have been taken aback by GEN Chiarelli's announcement about the use of H2H.jobs as *the* portal, it is clear from the discussion of the December 2011 transition summit above and the follow-up briefing for GEN Chiarelli, that even at the December 5, 2011 meeting, these two agencies did not agree to subordinate their decision-making on the portal to the Army and that the decision would not be made on the basis of Mr. Cramer's brief demonstration of the portal at the transition summit (indeed, as will be seen, the VA and DOL would prevail about two years later). That said, as discussed below, the Army obtained authority to

---

[13] The "Coke-Pepsi" survey results reflected in another slide in this presentation showed a marked preference for H2H compared to the other alternatives tested (R4, tab 52 at 10).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

use H2H.jobs as its interim portal solution until the task force made a final decision one way or another.

On Feb 10, 2012, LTG Bostick sent an email to BG Price explaining that he would be briefing the Chief of Staff of the Army (the CSA) the following day and that he needed to make a final decision about where to tell people to go for the employment portal. BG Price was directed to make an appropriate slide for that briefing. (R4, tab 55) The briefing slide presented the next day didn't quite make a final decision. Instead, it reflected that there were many portals in the "garage" available for use, including H2H, but that by the end of Fiscal Year 2012, they had hoped to have just one, though which portal it would be was to be the decision of the task force. The text of the slide ended by stating that, "Until DOD completes its recommendations, Army has proposed H2H as an interim solution." (R4, tab 56 at 19)

By March 2012, the use of H2H.jobs as an interim solution for the Army was official. On March 8, 2012, the TF ESC (executive steering committee) agreed that the Army was "free to proceed with the of use H2H on an interim basis" (R4, tab 58 at 2). The next day, there was an email from COL Ed Mason stating to a number of recipients that "[a]t this time, the Army is implementing www.H2H.jobs as our interim solution." This email would be forwarded by Mr. Young of OSD-RA to Mr. Cramer as an "FYI." (R4, tab 58 at 1) At about the same time (March 9, 2012), LTG Bostick sent an email to GEN Raymond Odierno (the CSA) and GEN Lloyd Austin III (the new Army Vice Chief of Staff, who succeeded GEN Chiarelli) informing them of the decision to use the H2H portal. GEN Austin commended LTG Bostick for his "great work" and urged him to "get the word out ASAP." In response LTG Bostick conferred with LTG Evans about the best way to do so. LTG Evans recommended the use of a so-called Fragmentary Order (or "FRAGO") to the already existing transition execution[14] order (or "EXORD") and the use of a "GOMO Sends."[15] LTG Bostick agreed with the LTG Evans' recommendations, though he posed an interesting question (for our purposes) to BG Price that does not appear to have been answered in the email record before us: "I need to understand if there are any funding issues related to this, or if OSD RA is covering all costs."[16] (R4, tab 59 at 1-3)

---

[14] On occasion, some witnesses or attorneys referred to an EXORD as an "executive" order, but in fact, it is an "execution" order (*see* tr. 5/112-13).

[15] "GOMO" is the General Officer Management Office and "GOMO Sends" is an email communication that goes out to all General Officers (tr. 5/169).

[16] We remind the reader that this question was posed on March 9, 2012, by LTG Bostick who was present with Mr. Cramer during the December 5, 2011 briefing and his subsequent meeting with GEN Chiarelli during which Futures alleges a contract was made. It can and should be taken as evidence that no agreement between the Army and Futures was made at that time and that it was seen as plausible by Army leadership that the existing contractual

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

An important post script to this decision-making is that, at a transition summit on May 22-23, 2012, the TAP was transferred from BG Price's purview to LTG Evans's as the Adjutant General. The reason for this was basically that BG Price's job was more policy oriented, while LTG Evans's position as Adjutant General was more operational. (Tr. 5/173-74)

D. The Army Publicly Embraces the H2H Portal

It is undisputed that the Army went "all in" on the H2H.jobs portal and that, true to the direction from its highest leadership, widely promoted the use of the H2H.jobs portal in many instances throughout 2012 and into early 2014. A non-exhaustive, but representative,[17] list of actions follows: The FRAGO recommended by LTG Evans was duly issued (the parties did not stipulate to a date for the FRAGO, and there is no date apparent on its face (see R4, tab 60), but it appears to have been in mid-March 2012), stating that H2H.jobs was selected as the primary location for soldiers to connect with future employers (see Joint Stip. ¶ 35). Additionally, information about the selection and availability of H2H.jobs was widely circulated to Army leadership (see, e.g., R4, tab 67 at 17 (Senior Leader Forum); R4, tab 69 (email from LTG Bostick to fellow generals through the GOMO informing them of the H2H.jobs site and encouraging its use)[18]). Moreover, the Army issued several press releases about H2H.com, including, but not limited to, a March 20, 2012 Army News Service article (see R4, tab 62); an almost identical article on the "Soldier for Life" website (see R4, tab 64); and a re-posting of the article on www.army.mil. "the official homepage of the United States Army" (see R4, tab 65. LTG Evans appeared on FOX News on September 20, 2012, and mentioned the program (see R4, tab 102). As late as April 10, 2014, Mr. Herd mentioned the H2H.jobs portal in a

---

relationship between Futures and OSD-RA would address the Army-wide use of H2H.jobs. Coming as it did, well before any dispute arose between the Army and Futures that could conceivably color LTG Bostick's posture, the existence of that question is particularly salient. It is also another nail in the coffin holding Mr. Cramer's allegation that an $8 million price had been discussed amongst the parties.

[17] Additional articles and communications may be found in the parties' Joint Stipulation of Undisputed Facts, which we have reviewed carefully and considered in making our decision today, but omit here because they do not materially alter our findings and the reader does not need even more additional and repetitive details.

[18] With respect to the GOMO Sends, LTG Evans testified that it would never have been sent if access to H2H.jobs for active duty members was seen as requiring an additional contract, because promising such a contract would have been beyond the Army's authority (tr. 5/171). The same concern would apply to any other public statement the Army made regarding H2H.jobs.

12

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

speech to a Tennessee Rotary Club (Joint Stip. ¶ 338).  Reference to the H2H.jobs portal even made it into Congressional testimony to the Senate Appropriations Committee on March 21, 2012 from the CSA, GEN Odierno, who identified H2H.jobs as the Army's "official employment portal" (R4, tab 63 at 2) and LTG Evans, who testified to the House Veterans Affairs Committee in September 2012, though about job fairs, rather than the portal (Joint Stip. ¶ 104).

    IV.  <u>Actions Taken by The Army in Furtherance of VOW Act Compliance After it Adopted H2H.jobs as its Interim Portal</u>

    A.  <u>Pilot Job Fairs</u>

Part of the suite of efforts to help transition service members to civilian employment was the holding of job fairs at various bases throughout the country.  The Army wanted to make Futures part of that effort and in the summer of 2012 through the fall, it held several pilot programs to do so.  (*See* tr. 1/159)  Since these were not remotely within the scope of work in the existing Hooah contract, the Army Adjutant General's Directorate explored means of modifying that contract to cover them. Mr. Cramer testified that he had told LTG Evans that the pilots would cost a certain amount of money and that he was told to go ahead and do them, implying that there was a contract (tr. 1/161; 8/100).  There is no written evidence in the record to support this assertion, however.[19]  At most, there is a June 1, 2012 "SITREP" (situation report) from the Army that indicates Futures was "not funded or contracted" to do the effort at Joint Base Lewis-McCord, which would cost approximately $90,000 (R4, tab 380A at 65).  A later June 8, 2012, SITREP refers to the initiation of a "contract to demonstrate OSD RA's H2H job connection capability during the pilot" (R4, tab 380A at 68).

In an email dated June 8, 2012, Ms. Linda Herrman, the Chief of the Business Management Office (BMO) of that Adjutant General's Directorate, laid out to LTG Evans the efforts that had been made to find a solution using the currently

---

[19] Mr. Cramer testified that there were documents in the record reflecting a $1.2 million price discussed between him and LTG Evans (tr. 8/100), but those records have not been identified and we did not find them upon our review.  The records with some costs in them was a "white paper" created by Futures and sent to LTG Evans around June 7, 2012 (*see* R4, tab 392 at 351-53) (amounts summing to $1.225 million for job fairs at four bases).  The military installations discussed in that white paper were not all the same as the ones that the job fairs were actually performed at, indicating that these were preliminary discussions in any event (tr. 8/187-88)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

existing Hooah contract.  The upshot of this email was that it would be impractical to make such an attempt.[20]  (*See* R4, tab 81)

Having determined that it could not use the existing Hooah contract to pay for the pilot job fairs, on August 7, 2012, the Army's Mission and Installation Contracting Command (MICC) awarded what is known as the "Hooah Job Fairs Contract" to Hooah (Joint Stip. ¶ 83; R4, tab 306 at 1).  This contract was for providing "virtual-supported job fairs" at five specified military installations over a five-month period between July[21] and November 2012 (R4, tab 306 at 15-16).  Importantly, this contract did not purport to include access to the H2H.jobs portal because the Army was not of the opinion that it was necessary:  as the government cost estimate used as part of the award process noted, "The H2H program is accessible at no cost to any person with military service" (Joint Stip. ¶ 73)[22].

But there was a problem with this contract.  As best as we may discern, the Army apparently thought that by contracting with Hooah, it would be obtaining services from Futures as the presumed subcontractor, but it wasn't.  Hooah, in fact, went on to perform job fairs without Futures (R4, tab 98 at 3; tr. 1/168-69)  The Army contracting officials did not realize the disconnect at this time because they viewed the Federal Acquisition Regulation as preventing them from directing an 8(a) contractor to select a particular subcontractor or even inquiring about who that subcontractor would be (tr. 6/22) (notwithstanding OSD-RA's apparently having done so in the original award of the Hooah contract).  Job fairs were, in fact, separately put on by both Futures and Hooah, but Mr. Cramer states that Futures was not paid for them and was unaware of Hooah's contract with the Army for them until very late in the game (tr. 1/155-170).  Indeed, ultimately, Hooah and Futures wound up doing competing job fairs at the very same base in the September 2012 timeframe, causing problems (R4,

---

[20] This email, read alone, may appear to refer to efforts to pay for access to the portal, and Futures (wrongly) characterizes it that way in its post-trial reply brief (app. reply br. at 5).  But as LTG Evans made clear, and as we read it as well, the subject was solely job fairs (tr. 5/179-82).  The June 1, 2012 SITREP might also be read the same way, *i.e.*, to be about the portal (*see* R4, tab 379A at 83), but it is really just about the job fairs (tr. 5/128).

[21] We do not know if the work on the Performance Work Statement scheduled for July 2012 actually occurred prior to contract award or if the date was changed.

[22] This was also consistent with LTG Evans's view at the time, as communicated in an email to Mr. Cramer sent on June 1, 2012, in which he discussed his desire for H2H to "connect Soldiers to jobs and companies having one place to go" and asked:  "Is this not what you are doing for OSD RA now?" (R4, tab 380A at 40).  The record shows no response from Mr. Cramer disputing this – which adds more evidence to the conclusion that Futures did not oppose the active duty force having access to H2H.jobs.

14

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

tab 380A at 117-18). The Army speculated that Futures was doing this "out of hide" or perhaps as part of the OSD contract (R4, tab 98 at 3). In fact, though we do not doubt that Futures wished and perhaps even expected to be paid for these job fairs, the pilots also served the purpose, as Mr. Cramer testified, for the Army "to demonstrate that the performance of our technology and our processes far surpassed anything out there for matching transitioning soldiers with civilian jobs" (tr. 8/205).

In any event, this comedy of errors makes Mr. Cramer's testimony that he had an agreed-upon contract for the job fairs somewhat implausible: as discussed above, Mr. Cramer's testimony is that he was very clear with the Army about how much the job fairs would cost and was in apparently good communication with the Army on this matter, but in early July when the Army awarded the contract to Hooah that it thought would funnel the money to Futures, nobody told Futures and, even more to the point, nobody from Futures asked where the money was. We find it more probable than not that events did not transpire this way and that at some point Futures must have known that Hooah had taken the contract, that no contract would be forthcoming for the job fairs, and just decided to perform the job fairs and absorb the costs of performance.

B.  Renewal of the H2H.jobs Contract by OSD-RA, but With a New Prime

On September 29, 2012, at the conclusion of the Hooah contract, OSD-RA changed vendors[23] for the H2H.jobs site and contracted with TASA to act as the 8(a) prime contractor through which Futures would be hired. This contract (the first TASA contract) had a period of performance from September 29, 2012 until June 28, 2013, with two six-month option periods that followed (R4, tab 6 at 1, 4-5; Joint Stip. ¶ 4). TASA contracted with Futures the day before this contract award, plainly to perform similar duties as a subcontractor to the duties Futures had previously performed for Hooah[24] (Joint Stip. ¶ 4).

On May 16, 2013, OSD-RA issued Modification No. P00002 to the first TASA contract, changing the period of performance of the first options from six months to 12 months and exercising option period one, thereby extending the period of performance through June 28, 2014 (R4, tab 9; Joint Stip. ¶ 4).

Consistent with the full implementation of the VOW Act in late 2012, discussed below, the demand for H2H.jobs case managers increased in 2013, and on July 31, 2013 OSD-RA and TASA entered into "the first TASA case management contract"

---

[23] Given the events described in the prior section, leading to tensions between Hooah and Futures, this change is hardly surprising.

[24] Apparently, whoever issued this contract at OSD-RA was not as constrained about directing an 8(a) contractor to subcontract with a particular contractor as the Army had been when it issued the Hooah Job Fairs contract.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

which increased the number of case managers assigned under the first TASA contract from 100 to 600 (R4, tab10 at 1, 9-10). This contract had a two-month "start up" period and an 11-month "access capability" period (R4, tab 10 at 3-4). Assuming the 11-month "access capability" period started immediately, the first TASA case management contract would conclude at the end of June 2014, when the first TASA contract (as extended by the option exercise) was set to conclude.

## C. The Army Continues its Implementation of the VOW Act

In the meantime, during the Fall of 2012, the Army moved forward with implementing the VOW Act, which had requirements that were effective on November 21, 2012. LTG Howard Bromberg, LTG Bostick's successor as the G-1 of the Army (tr. 4/54-55, 101), sent an email to GEN Odierno (the CSA), the Secretary of the Army, and others on November 7, 2012, as a situation report, setting forth a catalog of the things that were being accomplished as well as those matters presenting problems. His first concern was the lack of a central point of contact and confusion coming from dealing with the DOL. Industry was also apparently not nearly as enamored with the H2H.jobs website as the Army was, being either unaware of it or "frustrated with it" when they did use it. GEN Odierno responded to this note, expressing concern that there had been "no progress." In particular they were "floundering" because DOL was not providing adequate support and this should be led by the Department of Defense.[25] (R4, tab 124)

On November 13, 2012, LTG Bromberg sent an email to a host of recipients informing them that the VOW Act was being implemented, effective November 21, and that it included a number of steps to help soldiers with their transition to civilian life. It noted a "parallel effort" to connect soldiers with jobs, but did not specify that it was being accomplished through H2H.jobs (App. Hearing Ex. 8 at 4). A new FRAGO was issued which noted (in one paragraph in a 26 page-long document) that "[t]he Army is using Hero 2 Hired (H2H) to provide one primary location where soldiers . . . can connect with private industry employment opportunities" (App. Hearing Ex. 9, at 10).

---

[25] Futures characterizes this email as a "rebuke" from GEN Odierno to LTG Bostick and implies that subsequent work on H2H.jobs with Futures stemmed from that "rebuke" (app. br. at 28). First, of course, the email was to LTG Bromberg, rather than LTG Bostick, but more importantly, there is no evidentiary link between the GEN Odierno email and subsequent actions with H2H. We read this email, in the context of LTG Bromberg's testimony (see tr. 4/73-74), as expressing frustration with the Department of Defense not being the lead and DOL providing inadequate support. The status of contracting for H2H.jobs does not appear to have been the sort of thing that was on GEN Odierno's radar.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

V. Futures and the Army Make Efforts to Obtain a More Comprehensive Contract Directly Between Futures and the Army in Fiscal Year 2013 (They Fail)

A. Events Leading up to the Army Seeking a Direct Contract With Futures.

Although the Army had effectively piggybacked on the Hooah and TASA contracts when using the H2H.jobs portal, it recognized that what it wished to do with the contract would be too big to be handled as part of the 8(a) contract which the Hooah and TASA contracts represented (tr. 3/154). Ms. Gabriele Tyler of the Transitions Strategic Outreach (TSO) office of G-1 testified that LTG Bromberg had entertained the misapprehension in late 2012 that Futures had a contract with the Army for the work it did,[26] but once he realized that it did not, in a meeting held on November 27, 2012 whose attendees also included Mr. Steven Horan (Futures' president) and Mr. Cramer (*see* tr. 3/230-31, 234; tr. 4/20; R4, tab 128), directed COL Robert Yost[27] to work to get a contract directly with Futures (tr. 3/40-41; tr. 3/156-57), although he was to use normal contracting procedures to do so (tr. 3/156; 3/197-98). As Ms. Tyler subsequently explained, the problem was that the Army was only getting some of what it might have out of its dealings with Futures and that they "could've been so much further down the road" if more were done (tr. 3/165). To be clear, the Army wanted additional services not covered in the Hooah or TASA contracts (tr. 3/191) and Futures would have had to build new capabilities if it were to do all the work it proposed in the white papers to COL Yost (tr. 3/105). As LTG Evans explained, the Army was seeking longer use of the H2H tool "with more rigor in the metrics to determine outcomes" from this contract (tr. 5/228). Mr. Herd's testimony was similar, stating that the ability to track which elements of the employment program were successful and which were not was considered "the holy grail" of the effort, and what the Army sought in a new contract with Futures (tr. 8/30).

This meeting and the direction to work to award a direct contract to Futures, it should be said, did not come out of the blue. Futures had been laying the groundwork with the Army for a new contract since around October 2012, if not earlier. On October 27, 2012, Mr. Cramer forwarded a draft "white paper" to LTG Evans

---

[26] We are not at all surprised by his confusion: he had come to the job only recently and the 8(a) Hooah/TASA contracts, which would have been the most expeditious to award, would obscure who the prime contractor actually was, given the fact that Futures appears to have performed almost all of the work, as discussed above. Indeed, LTG Evans remarked in his testimony that around this timeframe, LTG Bromberg was still working to fully understand all that was going in in the transition assistance arena (tr. 5/185-87).

[27] COL Yost was the director of the TSO from August 6, 2012 until some time in May 2014 when he retired (tr. 3/211). He reported to Mr. Herd (8/28-29).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

demonstrating "how we would like to support ACAP"[28] (R4 tab 32 at 670). At some point (the record does not state exactly when, but around this time seems to fit the evidence best) LTG Evans recalled having directed COL Yost and Mr. Herd to work on a longer term H2H contract (tr. 5/141), though he did not direct them to perform the contracting function (tr. 5/144-45). In the meantime, Futures sent three different "White Papers" to Army officials (two to LTG Evans, one to a Mr. Webb) between October 26, 2012 and November 1, 2012, setting forth additional proposals from Futures for more work. On November 6, 2012, Mr. Horan forwarded these papers to COL Yost for his use. (R4, tab 32 at 687) By November 12, 2012, COL Yost had combined the three White Papers provided by Futures into a single document to serve as "the initial paperwork to get the contracting vehicle started" (R4, tab 32 at 700). Two weeks later, on November 26, 2012, the day before the big November 27, 2012 meeting with LTG Bromberg, Futures forwarded to COL Yost, "cost structures" to be used for the new proposed contract (*see* R4, tab 133 at 2). Cost, however, was never discussed during the November 27, 2012 meeting with LTG Bromberg (tr. 3/117).

LTG Evans puts the events leading up to the meeting, and the meeting itself, into context, stating that "at that time, there was some marketing going on of H2H and its capability by Mr. Cramer" (tr. 5/146). This is consistent with LTG Evans's view of the white paper he had received from Futures as including some additional things that the Army was looking for, but also including other things which "[w]e didn't need." (tr. 5/143-44; *see also* tr. 5/193-94; 5/209-10)).

B.  COL Yost's Efforts to Prepare the Contract Requirement and get it to the Proper Contracting Channels.

Having gotten his marching orders from LTG Bromberg on November 27, 2012, COL Yost continued to work on paperwork that could lead to a contract.[29] Email correspondence between Ms. Linda Herrman and COL Yost on November 28, 2012, shows Ms. Herrman leading COL Yost through assembling documents to get a contracting package put together (R4, tab 133 at 4-5). He forwarded these documents to her later that day (*id*. at 4). These documents are the "White Papers" that COL Yost had received from Futures earlier (tr. 3/237). In the same email string, Ms. Kelly Kelley (Ms. Kelley's first name is, in fact, similar to her surname) a management and program analyst at the business management office of the Army Human Resources

---

[28] ACAP stands for Army Career and Alumni Program Office. It was the office largely responsible for complying with the VOW Act (tr. 8/11).

[29] It may be inaccurate to suggest that COL Yost only acted because of LTG Bromberg's order at this meeting. Mr. Herd apparently directed him to begin work on assembling contract requirements earlier (tr. 8/30-31), which would be consistent with the communications COL Yost was receiving from Futures before this meeting was held.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Command (tr. 3/215), told COL Yost on November 30th that there were a lot of problems with the documents and that they would have to work through them (R4, tab 133 at 1-2). Indeed, COL Yost had no experience or training in government contracting[30] prior to this time and, it almost goes without saying, was never a contracting officer (tr. 3/214).

Meanwhile, although Futures knew it did not have a contract with the Army yet, it began to anticipate an award. On December 4, 2012, Mr. Horan sent the Futures Board of Directors an email about the status of contracting based on a discussion he'd had with COL Yost that day. In the email, Mr. Horan stated that the Army was still pondering whether to issue three separate contracts (the approach preferred by Futures) or just one. With one contract, Futures would need a "GSA qualification,"[31] which was still pending. Mr. Horan further notified the Futures Board of Directors that after information was sent to the Army contracting, it "usually" took 30 to 45 days before the issuance of a formal contract. He also noted that "[t]he Army contract value amounts are estimated to be (before any negotiation) to range [sic.] between $12.5M to $16.5M depending on deliverables over 2 to 5 years depending on component." (R4, tab 122, at 10) Thus, even at this point, there was uncertainty about the number of contracts that would be considered, how much Futures would be paid, how long the period of performance would be, and when any contract would be awarded.

COL Yost continued to update Mr. Horan about the progress towards getting a contract awarded, though it was never as quick as hoped. He sent an email to Mr. Horan on December 19, 2012, telling him that the H2H.jobs procurement document had been submitted to "Team A" for approval, which was supposed to be done by the end of that week, and would then go to "Team B for final processing/approval." This email did not explain what the various "teams" were or how long "Team B" would take. (R4, tab 141) On January 29, 2013, COL Yost sent an email to Mr. Horan conveying progress and that he had "a long but good conference call with contracting yesterday" with the bottom line being that they had "moved the ball closer to the goal line" (R4, tab 157 at 1). Mr. Horan responded that they had responded to certain questions from "GSA office" which had been resolved quickly

---

[30] COL Yost referenced not having his "COR Training notes" in an email (*see* R4, tab 174 at 1), which caused Futures' counsel to suggest that he *had*, in fact, received training as a contracting officer's representative at some point. COL Yost conceded the accuracy of the email, but maintained that he'd had no real training as a COR. (*See* tr. 3/216-17) Based on such things as his clear lack of knowledge, as described below, about what a J & A is, we find that whatever training COL Yost would have had was minimal.

[31] Though this email did not say so directly, we believe this refers to getting on a GSA schedule – something that Futures had apparently obtained around this time (R4, tab 36 at ¶ 75).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

and that it appeared that they were "very close to the finish line there as well." He added that there were significant new features on H2H.jobs that Futures was nearing completion of and which corporate and military sources were very excited about. (*Id*.) A new performance work statement for a contract was drafted on February 11, 2023 (*see* R4, tab 163; tr. 4/36 (confirming date of the document)).

On March 15, 2013, COL Yost sent an email to Ms. Kelley inquiring about the "true status" of the H2H web platform request: he had read that it was "Waiting for the J + A and the go forward for signature from TAG to HRC" and wanted also to know what a "J + A" was. Ms. Kelley responded that the package was going through final review in her office and that a "J&A" was a justification and approval necessary for a sole source contract award. She also forwarded him a template for a J&A so that he could work on preparing it. (R4, tab 174 at 1)

On March 19, 2013, COL Yost sent an email forwarding a partially completed J&A to Ms. Kelley and others, though that document had numerous areas that COL Yost thought required Ms. Kelley's attention and perhaps revision (R4, tab 175 at 1-2; *see also* tr. 5/40-44).

C. <u>OSD-RA Chimes in, Seeking to Offload H2H.jobs to the Army</u>

While COL Yost worked to advance the proposed contracting action through Army channels, OSD-RA reached out to LTG Bromberg to lobby for a similar action (it is not at all clear whether OSD-RA knew of COL Yost's efforts). On March 15, 2013, LTG Bromberg received an email from BG David MacEwen (LTG Evans's successor as the Adjutant General) informing him of a planned video teleconference with Ron Young from OSD-RA scheduled for the following Monday. In this teleconference, they were going to discuss ultimately moving H2H from being an OSD-RA managed contract to one being run by the Active Component of the Army.[32] The important points in this email for our purposes included the statements that:

> *Futures Inc is contracted with OSDRA to provide the
> H2H.jobs platform  *The platform mainly supports the
> Guard and Reserve Services (Army, Navy, AF, Marine and
> Coast Guard).
> *The Army Active Component transitioning force is not
> turned away from using H2H capabilities.

---

[32] In discussing this issue, LTG Bromberg explained that he recognized H2H.jobs to be "an OSD program" rather than an Army one (tr. 4/79-80). This again underscores that the Army viewed H2H as being provided under the auspices of the OSD-RA contract, rather than a separate Army contract.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> SUMMARY: TSO believes Mr Young will dialog with
> LTG Bromberg on the future opportunity for the Army
> (Active Component) to contract with Futures, Inc (H2H)
> and eventually become the Executive Agent on behalf of
> OSD for the H2H program. The current contract ends in
> September 2013 with two option periods, both options are
> six months.

(Hearing Exhibit 15 at 1) (format as in original)

LTG Bromberg testified that he did not recall a particular meeting with Mr. Young but he did recall that there had been talk of H2H's future with the Army. Up until this point, LTG Bromberg's view had been (and remained) that the Active Duty Army was utilizing the then-existing OSD-RA contract for its requirements and that this was acceptable. (Tr. 4/82-83) LTG Bromberg testified that he did not recall if he discussed contracting with Mr. Young during this meeting and that he (LTG Bromberg) had no contracting responsibilities (tr. 4/86), which was a point he emphasized in his further testimony (tr. 4/87-88).[33]

For his part, Mr. Young testified that he did not believe the Army could use the contract free of charge given the fact that the Army kept trying to add to its scope (tr. 4/144-45).[34] According to Mr. Young, his contracting officer told him that he could not modify the contract because it was an 8(a) small business set-aside (tr. 4/145) He also testified to discussing H2H with LTG Bromberg, likely as reflected in the email above. His recollection of the discussions was that the Army would be far better at defending the use of H2H.jobs against competitors sponsored by DOL and the VA than he would be, so it would be in everybody's best interest to make it into an Army program. (Tr. 4/145-46)

### D. Legal and Other Objections Prevent the Contract Award in Fiscal Year 2013

Meanwhile, COL Yost's efforts progressed, though the results were slower in coming than all involved had hoped. In a May 2, 2013 email to COL Yost and another Army officer, Mr. Horan complained that "the delay in the contract process continues

---

[33] LTG Bromberg was also very clear that he would not even discuss contract pricing with a contractor "because I'm not the contracting guy. That would be a high risk venture for me to delve into that area . . ." (Tr. 4/120)

[34] Mr. Young also submitted an affidavit on behalf of Futures in which he stated that in his "professional opinion . . . Futures should be paid for the work they did for the Army" (R4, tab 38 at ¶ 15). We understand and appreciate Mr. Young's view of the equities here, but that is a legal decision for us to make, not a matter of his professional opinion.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

to impact base level hiring events." COL Yost responded that the message and a similar voice mail "were received loud and clear." (R4, tab 191) In a briefing slide for the Adjutant General, reporting on the status of the H2H platform procurement as of May 16, 2013, COL Yost was described as the point of contact (R4, tab 200 at 3). COL Yost did not actually create that slide, though he did not suggest that it was inaccurate (R4, tab 372 at 168-69) and we find no reason to doubt it. In any event, the slide stated, among other things, that the package had gone through a staff review on April 12, 2013; that there had been final corrections on April 15; and that the Contract Review Board package was due back from that board on May 22, 2013. The slide also reflected that MICC had been notified that the award was needed by the end of June. (R4, tab 200 at 3)

The award was not made by the end of June. In an August 12, 2013 email updating progress on issues of importance to MG Richard Mustion, BG MacEwen noted that the H2H contract "was still pending," awaiting legal review, and that this "negatively impacts the Active." (R4, tab 230 at 4) In response to a follow-up question about how the lack of the H2H contract was detrimental to the active duty force, COL Yost sent a response in the email chain explaining that active duty soldiers were disadvantaged compared to their reservist counterparts because even though they could use the H2H.jobs tool, they did not have access to counsellors and that the active duty metrics were not being reported (R4, tab 230 at 1-2). As COL Yost explained in his testimony, though active duty soldiers did have access to the website, reservists under the OSD-RA contract got far more from Futures, such as counselling, and the Army did not get the same data on its soldiers that OSD-RA got from its dedicated contract (tr. 5/58-61).

On September 4, 2013, Frank Ulery, a contracting officer working on behalf of the Army Human Resources Command, reached out to TASA and informed the company that he was working "on a requirement to utilize the H2H program, much the same as you are doing for OSD, but for Active Component troops." The email had a performance work statement (PWS) attached and Mr. Ulery asked TASA to review it and let him know if TASA was in agreement. Two days later, on September 6, TASA responded that it needed time to review the PWS with its team, including potential subcontractors. (R4, tab 363 at 5-6)

When Futures saw the proposed PWS, it was far from pleased. Mr. Cramer sent an email to BG MacEwen in which he stated he had just gotten the PWS language from Mr. Herd, which was "[w]orse than even I expected." He further stated that they could not proceed given the lack of resources and lack of cooperation and that his "team will communicate through the standard contracting channels. If they can salvage anything it will only be a fraction of what we could have done to support you and our Soldiers. Very disappointing and just sad." (R4, tab 245 at 2-4)

22

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

BG MacEwen responded in an email to Mr. Cramer on September 10, 2013. In relevant part it stated:

> Sorry that you are disappointed, but think we are taking a measured approach considering the environment we are currently operating it.
>
> We are working to have a single-source contract with h2h/Futures/Geoff to extend what they are doing now with the RC to the AC. I know there is much more that you can do and once the contracting world gets through all the wickets I think that is where you will submit a proposal of both your proposed work and its cost. We'll review both (work and cost) and then begin to discuss the best solution. As I stated to you when we were at the McDonalds and later on the phone, I[,] like you, want to ensure I follow all of the contracting rules.

(R4, tab 245 at 2)

Mr. Cramer seemed a little mollified by this note, and he responded the same day, stating in relevant part:

> I know we have to get through the contracting process. My team will fully cooperate with whatever they need to move forward and I would never ask you to do anything outside the rules of engagement.
>
> You have my full support and we will get there. Keep the faith.

(R4, tab 245 at 1)

Through an email dated September 11, 2013, Mr. Horan continued to brief the Futures Board of Directors regarding the contracting posture and the suggested changes to the PWS that Futures had recommended to the Army. Amongst nine numbered Futures' objectives, Futures wished to "[a]lign TSO requirements to current H2H capabilities" and "Cement H2H into Army employment transition processes." Mr. Horan anticipated some give and take with the Army, with both parties pushing for things that the other might not necessarily wish for. (R4, tab 249 at 1)

In any event, even as BG MacEwen and Mr. Cramer were working towards what seemed to be an understanding, other problems in the contract review process

23

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

reared their heads, preventing the hoped-for award. On September 6, 2013, the Army's Technology & Business Architecture Integration Directorate (TBAI) forwarded the results of its review of the H2H contract, which were that it non-concurred in its award. The TBAI's concerns regarded the issue of whether there was any development or modification involved in the contract and what the license and maintenance fees were paying for. TBAI also noted that the contract had been analyzed by a fiscal law attorney who was concerned that there were legal problems with the proposed contract on both "contracting and funding" perspectives. (R4, tab 242 at 2). Ms. Kelley scheduled a conference call for September 11, 2013 to address the TBAI nonconcurrence issue. She wrote in the meeting invite: "Need their concurrence before this requirement can move to the SLRB. Goal is to have this awarded prior to 30 Sep 13." (R4, tab 246) The record indicates further issues and concerns regarding legal review of the contract (R4, tab 248). After some exchanges on the matter, BG MacEwen wrote an email to COL Robert Knutson on September 13 stating: "This is the craziness that will cause us total failure. Appreciate what you are doing to help unscrew this" (R4, tab 248 at 1). More meetings were held (*see* R4, tabs 250, 252) and on September 19, 2013, BG MacEwen wrote to MG Mustion that, "H2H is still hung up . . . latest is that our HRC lawyers non-concur. I thought as of this morning it was on track . . . but will work again tomorrow with BJ." (R4, tab 254 at 1) By September 24, 2013, Mr. Herd was conceding defeat and recommended the reprogramming of the money set aside for H2H because it would be lost at the end of the fiscal year coming on September 30, 2013, and then to "re-attack H2H in [Fiscal Year] 14" (R4, tab 255 at 1). This appears to have been the closest Futures would ever be to receiving a contract award from the Army for the H2H.jobs portal.

We end this section with an important note: as frustrating at it might have been to COL Yost, Mr. Herd, BG MacEwen, and LTG Bromberg that they could not effect the award of this contract by simply ordering it done, this limitation of authority was intentional: the chain of command for the award of contracts for the benefit of the Army Human Resources Command (HRC) does not go through that command, but through the Army Contracting Command and ultimately the Army Materiel Command (tr. 7/23-24). Thus, none of the officers listed above possessed government contracting warrants (tr. 7/24).

VI.  Efforts to Secure a Contract Continue Into Fiscal Year 2014; the Parties are Warier

Though Fiscal Year 2013 passed without a contract award, Futures remained doggedly determined to obtain a contract with the Army. On October 6 and October 10, 2013, Mr. Cramer sent emails to LTG Bromberg suggesting a meeting to discuss the many more things that Futures could do for the Army and to provide additional H2H usage information for his consideration (R4, tabs 257-58).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Meanwhile, the Army recognized that the status quo could not be maintained. In an October 17, 2013 email to Mr. Fred Vollrath of "OSD PR,"[35] LTG Bromberg warned of a "train wreck" due to the apparent imminent de-funding of the OSD-RA contract that provided the H2H.jobs portal. He asked Mr. Vollrath "what the plan is so we can properly plan." (R4, tab 260 at 1-2; *see also* tr. 4/124) The next day, he sent a follow-up email in which he told Mr. Vollrath that the Army had "decided to pursue [its] own contract vehicle for this type of capability" (R4, tab 260 at 1).

On October 24, 2013, Mr. Cramer sent an email to BG MacEwen informing him that Futures would be unable to support future hiring events for the Army because of lack of resources (R4, tab 261 at 1). On the other hand, on October 27, 2013, Mr. Cramer sent another email to LTG Bromberg touting Futures' ability to help the Army mission and seeking further direction (R4, tab 263). When that email was forwarded to BG MacEwen and Mr. Herd, the two agreed to be wary of "appear[ing] to 'direct' H2H to do anything [in the absence of] a binding contract" (R4, tab 264 at 1). The two had a similar email discussion after they received additional email correspondence from Mr. Cramer on November 12, 2013 (R4, tab 265). Futures sent a new H2H proposal to the Army on November 17, 2013 (R4, tab 267) and then sent a revised version the next day (R4, tab 268). In December, the H2H portfolio was transferred in the Army to the "Soldier for Life" (SFL) office[36], with the understanding that efforts were still being undertaken to secure an Army contract (R4, tab 270 at 2).

## VII. The Denouement: The VA's Portal Wins and Army Efforts on H2H End

In early January 2014, the SFL office was directed to compare H2H to the capabilities of a proposed VA system (R4, tab 272 at 1). Later in the month, the Army was given a tasker by the House Armed Services Committee staff to compare the costs of a different solution to H2H (R4, tab 275 at 2). Email traffic on January 31, 2014, made clear that very real evaluations were being undertaken to compare the VA's proposed solution with H2H (R4, tab 282). By mid-March 2024, the SFL office expressed its concern that further contracting for H2H.jobs could be prevented by the impending launch of a VA/DOL employment site combined with mandates to eliminate redundancy in the government (R4, tab 286).

Futures, meanwhile, continued to push for a contract and for the Army to use more of its capabilities. In an April 7, 2014 email to LTG Bromberg, Mr. Cramer stated that "We cannot continue to provide 24/7 support for the Army without a contract," while further noting that the Army was "only using a fraction of our capability" and that it could deliver large savings to the Army if only the Army took

---

[35] Mr. Vollrath was, at that time, the Assistant Secretary of Defense for Personnel and Readiness (Tr. 4/123).

[36] Soldier for life was a consolidation of two other offices in G-1 (R4, tab 271 at 3).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

advantage of it. (R4, tab 289 at 2-3) The Army internally recognized that it had no contract to support its use of H2H in an April 16, 2014 email from BG MacEwen to MG Mustion (R4, tab 292 at 1).

On April 23, 2014, with the announcement at Fort Campbell, KY by First Lady Michelle Obama and Dr. Jill Biden, of "a new 'Veteran's Employment Center' being led by the Department of Veterans Affairs . . . to be the single federal source connecting . . . transitioning service members" (R4, tab 293 at 1), the Army lost the bureaucratic battle with VA and DOL over who would run the employment portal. Reporting on the announcement to his superiors the next day, Mr. Young made clear that the days of the H2H.jobs portal were numbered, although in the short term, it would survive for transition purposes (*id.*). By April 28, 2014, LTG Bromberg scheduled a meeting with other Army leaders to "discuss the OSD decision to discontinue the use of the H2H Platform with the G-1" (R4, tab 294).[37]

On May 12, 2014, the Deputy Adjutant General of the Army sent Mr. Cramer a letter thanking him for his support of soldiers and their family members and conveying that the "interim" H2H.jobs portal was being replaced by the DVA portal. He continued to say that because the H2H contract was between OSD-RA and TASA, the Army was neither obligated nor authorized to compensate Futures and that Futures should direct any such inquiries to TASA. (R4, tab 296)

Interestingly enough, OSD-RA awarded a second contract to TASA on June 29, 2014 (the second TASA contract) (R4, tab 21 at 1). The second TASA contract provided a one-year period of performance with another one-year option (*id.* at 3) and was for the "continued maintenance and upgrade of the existing H2H.jobs web platform" on behalf of OSD-RA (R4, tab 21 at 7). Both the second TASA contract and a second TASA case management contract (which was awarded on July 8, 2014 (R4, tab 22)) were terminated for the convenience of the government, effective September 11, 2014 (R4, tabs 23-24). With the termination of these contracts, Futures submitted termination settlement proposals to the prime contractor, TASA, for costs it incurred from June 20, 2014 to September 11, 2014 (R4, tab 351 at 1 (second TASA contract); R4, tab 351 at 8 (second case management contract)). A termination

---

[37] Mr. Cramer testified that at some point in April 2014 he "cornered LTG Bromberg in his office" and told him that Futures could not continue without being paid and LTG Bromberg told him he did not have any money to pay him because of the White House decision to go with the VA portal (tr. 8/147-48). This is subtly different than the affidavit submitted by Futures employee William Abb, who wrote that he attended a meeting with LTG Bromberg and Mr. Cramer on April 25, 2014 in which LTG Bromberg told Mr. Cramer that no contract could be forthcoming at that time in light of the government's decision to go to eBenefits, (the VA portal) (R4, tab 39 at ¶¶ 8-10).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

settlement, with an effective date of October 28, 2015, was executed between the government and TASA[38] for the second TASA contract. This settlement included standard language that released claims from the contractor, subcontractor, and others. (R4, tab 27 at 1)

VIII. Futures Files a Claim

On December 12, 2017, Futures submitted a certified claim to the Army seeking $24,003,475 in compensation "for the provision of certain transition and employment support services to the Army Active Component" (R4, tab 302 at 1). The claim propounded several theories of entitlement: first, that it had an express contract with the Army (*see id.* at 6); second, that it had a contract implied-in-fact (*id.* at 6-9); and third, that any infirm contract was ratified by the Army's acceptance of Futures's performance (*id.* at 9-12). Futures has presented no evidence that it had ever alleged the existence of a contract between it and the Army prior to this claim.

This claim was denied in full on February 9, 2018, by Ms. Leslie Vessels, a contracting officer, who found there was no express or implied contract between the Army and Futures and that no Army officials promised payment to Futures (R4, tab 303).

Futures timely appealed this decision to the Board.

PROCEDURAL POSTURE

In the course of this appeal, the parties submitted cross-motions for summary judgment as amended, which they fully briefed (we refer to these as the MSJs). The MSJ filed by Futures alleged: 1) that there was an express contract between the Army and Futures for the provision of services for the active duty Army which the Army breached (Count I of its complaint); 2) that, in the alternative, the Army breached an implied-in-fact contract (Count II of the complaint); 3) actions and inactions of very senior Army officials and contracting officers acted to ratify a contract (Count III of the complaint); 4) that Futures is entitled to payment on the basis of *quantum meruit* (Count IV of the complaint); and that 5) Futures is entitled to payment for termination costs (Count V of the complaint) (*see* app. MSJ at 31-43). The government's motion alleged that there was no contract for which Futures could obtain relief because: 1) Futures produced no evidence that a government agent exercised actual authority to bind the government to a contract with Futures; 2) Futures produced no evidence that a government agent with actual authority issued either an express or oral contract;

---

[38] Though the government contracting officer executed this document on October 26, 2015, TASA's representative (for reasons we do not know) did not execute it until March 22, 2017 (R4, tab 27 at 1).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

and that 3) Futures produced no evidence that a government representative with authority to bind the government had actual or constructive knowledge necessary to find ratification of a contract (*see* gov't MSJ at 14-19). The judge assigned to this appeal until her retirement, Judge Young, deferred deciding the motion until after completion of the hearing. Although we find the legal framework briefed by the parties for the summary judgment motion to have been helpful, we now decline to separately consider it and subsume it into our decision on the merits: at this point, having already taken live[39] testimony, a decision based upon our making findings of fact, rather than findings of undisputed fact with all reasonable inferences made in favor of the non-moving party, *see*, *e.g., Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)), will be more robust.

## DECISION

The dispositive question in this appeal is whether there was a contract or contracts between the Army and Futures for Futures to provide H2H.jobs services to the active duty Army in return for payment. If we find in favor of Futures, there is a secondary question of whether the Army owes Futures termination costs stemming from the abrupt termination for convenience. Futures alleges it had an oral contract with the Army; though, if that is not the case, it had a contract implied-in-fact; though if that is not the case, there was a contract that was ratified by individuals with contracting authority; and failing that, that the Army institutionally ratified its unwritten contract. Futures further argues that allowing the Army to profit from its uncompensated work would be "unfair" and that it would thus be entitled to recompense. Finally, Futures makes a hard-to-parse "unilateral mistake" argument. We find none of these arguments to be persuasive and, as the burden of proof is on Futures, deny this appeal and enter judgment in favor of the Army.

### I.  Basics:  The Prerequisites for a Government Contract

The requirements of a government contract are much like those applicable to any other contract. As the Court of Appeals for the Federal Circuit (the Federal Circuit) has explained, they include ". . . a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997) (citations omitted); *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).

---

[39] The eight-day hearing was, in fact, conducted via live video teleconference.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The Federal Circuit has further elaborated about the importance of definiteness, which will be important here:

> To be valid and enforceable, a contract must have both consideration to ensure mutuality of obligation, *see generally* Restatement (Second) of Contracts §§ 71,72 (1981), and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.' *Id*. §§ 33(2); *see, e.g., Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572-74 (Fed. Cir. 1991).

*Ace Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000); *see also Gardiner, Kamiya & Assoc. v. Jackson*, 369 F.3d 1318, 1322 (Fed. Cir. 2004). To be sure, the Federal Circuit has held "agreements to agree" are enforceable and suggested that the "courts should be slow to deny enforcement [of such an agreement] on the basis of indefiniteness in the contract," but that still requires an agreement "specif[ying] that certain terms will be agreed upon by future negotiations." *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572 (Fed. Cir. 1991) (citing 1 A. Corbin, *Corbin on Contracts*. § 97 (1963)).

## II. There was no Express Contract Here

We wrote a long, narrative description of the facts above which underscores what did not happen: to wit, an agreement upon terms between the parties in any semblance of a contract. Futures does not set forth a particular date (except perhaps December 5, 2011) for when the express contract was made. Indeed, Count I of its complaint, which alleges an "express contract" (*see* compl. ¶ 301) never says who made the contract, when it was made, or where the contract was made (*see* compl. ¶¶ 303-07). This lack of specificity is no happenstance. In any event, we will address both the December 5, 2011 date and the more amorphous non-specified date to demonstrate that no contract was made in either case.

## A. No Express Contract was Made on December 5, 2011

Though, as discussed above, Mr. Cramer's opening position was that he made a contract with the Army on December 5, 2011, that position was quickly disposed of at the hearing: Mr. Cramer conceded that no contract was "finalized" on that date because important terms like the length of the contract were not discussed. Likewise, he conceded that price of the contract was not discussed. These are critical terms to any contract. Moreover, as Mr. Cramer described it, there was no discussion of any of the kinds of details that would be necessary to create an enforceable contract. Hence,

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

in no way was it definite enough to constitute a contract, express or otherwise. *Ace Federal Reporters*, 226 F.3d at 1332.[40]

Consistent with the lack of definitiveness on key terms, neither party actually believed there to be an agreement, indicating that there was no final meeting of the minds. Certainly, the Army had no belief that there was an agreement: the only testimony from an Army individual present at the meeting (LTG Evans) was that there was no statement from anybody that there was a contract. Moreover, the December 22, 2011 briefing to GEN Chiarelli was inconsistent with anybody involved thinking that there was a contract at that point, discussing steps that remained to be taken before a portal was selected. The February 10, 2012 email from LTG Bostick to BG Price about briefing the CSA was also written as if no final decisions had been made, which is particularly important, given that these are the two individuals at the December 5, 2011 meeting who would have known about any contract and they apparently did not believe there to have been one. Likewise, the March 9, 2012 email from LTG Bostick to LTG Evans, which asked about whether OSD-RA would cover all costs for utilizing H2H.jobs, was not making the kind of inquiry that a person who had already agreed to a contract the preceding December would have likely made at this late date. Moreover, as noted above, during an email conversation that LTG Evans had with Mr. Cramer in June, 2012, LTG Evans characterized (without correction by Mr. Cramer) the portal work as something being done in the guise of Futures' relationship with OSD-RA.[41] If there were a separate contract between the Army and Futures on December 5, 2011, these communications within the Army and between the Army and Futures would have reflected that fact, but did not.

Indeed, Mr. Cramer certainly did not believe there to be an agreement at that time: he agreed in his cross examination that no definite contract was made at the December 5, 2011 meeting and the email he sent to the Army on December 10, 2011, about the efforts that the VA and DOL would make to "crush" the Futures portal indicated that matters were not, in fact, settled. He never corrected LTG Evans when he implied that the work was being conducted under the auspices of the OSD-RA contract, nor did he *ever* submit an invoice to the Army or request a written contract

---

[40] Futures never alleged that there was an agreement to agree, of course, and, in any event, the facts don't support our finding that there was any kind of framework agreement in place "specifying that certain terms [would] be agreed upon" in specified future negotiations. *See Aviation Contractor Employees*, 945 F.2d at 1572.

[41] As we address later, Futures characterizes this as a unilateral mistake on the part of the Army. The point here, though, is that nobody (including Futures) characterized the provision of the portal services as being provided based on a separate contract from the Hooah contract.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

to execute. Indeed, we find it utterly implausible that Mr. Cramer believed there to be a contract between Futures and the Army, but never once submitted an invoice over a period spanning more than a year. No business incurring substantial costs acts that way when it already has an agreement in hand. Indeed, this stubborn fact undercuts all Futures allegations that contracts may have been formed at later dates or should be implied-in-fact. Mr. Cramer may well have thought that he would ultimately get an additional contract, but all indications were that he did not believe that he had it just yet.

And the final reason that we can be certain that there was no express contract with the Army on December 5, 2011, is that nobody with any authority to bind the Army was present. The Army has presented affirmative evidence that no contracting officers were at any of the meetings held that day in the Pentagon, and Futures (which bears the burden of proof) has offered no evidence to the contrary. We will address Futures' fallback position that the contract was later ratified (either by a person with proper authority or institutionally) later in this decision, but at this point, even if there were a contract with definite terms and even if the parties had a meeting of the minds that they intended to contract on December 5, 2011, there would be no express contract as of that date.

B. No Express Contract Between Futures and the Army was Entered at any Subsequent Date

Although there may be some plausible hypothetical in which an express contract could be found to have been entered at an unknown date with unspecified individuals (perhaps; we are skeptical), we do not see that happening here. With the exception of the December 5, 2011 date, Futures has propounded no specific date for entering into an express contract. This makes it impossible to determine the actual terms of any such alleged contract and whether it was ratified by any person with authority to do so. Moreover, in addition to there being no evidence of a contract, there is affirmative evidence (in addition to that already discussed in the section above) that there was no contract.

For convenience, we will divide our analysis into two separate time periods: the first is the time period from December 6, 2011 until approximately November 27, 2012 when LTG Bromberg directed COL Yost to undertake preparatory actions for the award of a contract to Futures; the second will be the time period from November 27, 2012 until the termination of the portal in May 2014.

1. No Express Contract Was Entered Between December 6, 2011 and November 27, 2012

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

With the possible exception of the date the FRAGO was issued, "selecting" the Futures portal (which we will return to) Futures never identifies a time that a contract was awarded during this period, which certainly constitutes a red flag. Moreover, all of the deficiencies which apply to finding a contract on December 5, 2011, apply with equal force to the time period following that date: there was no agreed-upon statement of work; there was no contract term or start date or end date; and there was no agreement upon the payment to be made.[42] Without these terms, any agreement would be illusory. And let us be clear, during this time period, neither Futures nor the Army thought there to be such a contract and Futures recognized the need for greater specificity. In the weeks prior to the November 27, 2012 meeting, Mr. Horan forwarded to COL Yost the so-called "white papers" proposing a contract structure and cost. These details were thus both recognized by Futures as being both necessary for contract formation and not having been previously agreed upon. Consistent with this recognition, when Futures met with LTG Bromberg on November 27, 2012, it was involved in the discussion in which LTG Bromberg was informed there was no contract between the Army and Futures and Futures never alleged otherwise, which it certainly would have done if there had been a contract. This pretty much disposes of the notion that there was an express contract between the Army and Futures during this time period. The "selection" of Futures in the FRAGO was obviously not seen by either party as creating a contract (as reflected in the November 27, 2012 Bromberg discussion) nor did it add a single one of the terms that Futures concedes were missing from the December 5, 2011 discussion.

Indeed, the closest thing to an agreement that Futures and the Army ever had during this time period was the abortive effort to pay Futures to put on the job fairs, but both the Army and Futures recognized that no contract was ever awarded and the parties both recognized that the Hooah Job Fairs contract did not, in fact, pass money on to Futures and, of course, was with Hooah and not Futures.

### 2. No Express Contract was Entered After November 27, 2012

The facts make very clear that COL Yost was given the direction to go through contracting channels to effect the award of a contract to Futures after the November 27, 2012 meeting. When Mr. Horan wrote to the Futures Board of Directors in December 2012, he spoke of the award of a contract in the future, though he thought that would be 30 to 45 days from then. He even made clear that important terms, like cost, the number of contracts, the deliverables, and the number of years it would last, had not yet been decided. This email confirms that not only was there

---

[42] As we noted in the Facts section, above, we do not credit testimony that a firm $8 million figure was propounded by Futures until it made its proposal to the government in late 2012.

32

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

no contract awarded at the November 27, 2012 meeting, but that there were substantial issues that needed resolution before such an award.[43]

Those issues (and others), as the Facts section makes clear, were never resolved. The Army was always seemingly close to making a contract award, but never able to get it done. We sympathize with the very reasonable palpable frustration expressed by Futures during the period that it waited, in vain, for the contract award. We sympathize further with Mr. Cramer's disappointment when it became clear in September 2013 that any award would be more limited than hoped, although that difference in expectations underscores, yet again, that the parties were never in full agreement. Sympathy, however, does not change the facts that the contract was never awarded and that Futures, though being told it was just around the corner, knew that it wasn't awarded. Mr. Cramer, of course, recognized and accepted the need to follow the formal process as reflected in his email conversation with BG MacEwen in early September 2013.

### III. There was no Implied-in-Fact Contract

Futures' fallback position is that it had an implied-in-fact contract with the Army. Unfortunately for Futures, many of the same facts which doom its argument that it had an express contract foreclose its contention that it had an implied in fact contract.

### A. The Requirements for an Implied-in-Fact Contract

As the Federal Circuit has often explained, an implied-in-fact contract shares the same requirements as an express contract, except that the nature of the evidence is different:

> An implied-in-fact contract with the government requires proof of (1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) "actual authority" on the part of the government's representative to bind the government in contract. *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998). Thus, the requirements for an implied-in-fact contract are

---

[43] It is also impossible to imagine this email being sent if there had been a contract award between December 5, 2011 and the November 27, 2012 meeting: it recognized that the contracting process was a formal thing that went through a process, not the "from the hip" award that Futures seems to argue occurred here, and it makes no mention whatsoever of an already-existing award, which would have been expected in this context had it existed.

33

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> the same as for an express contract; only the nature of the evidence differs. An implied-in-fact contract is one founded upon a meeting of minds and "is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Balt. & Ohio R.R. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923).

*Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003); *see also City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990).

  B.  The Circumstances do not Support Finding that there was an Agreement –
      Tacit or Otherwise – Between the Army and Futures Which met the
      Elements of a Government Contract

Every infirmity discussed in the previous section precluding the finding of an express contract between the Army and Futures applies with equal force to the allegation that there was an implied-in-fact contract: in a nutshell, the most basic of terms were never agreed upon; though each side wanted a contract and even expected it to be awarded in the future, both recognized that it was never finalized;[44] and nobody with the authority to contract ever agreed to it. Indeed, "the conduct of the parties," a critical aspect for proof of implied-in-fact contracts, *see Balt. & Ohio R.R.*, 261 U.S. at 597 (cited by *Hanlin*, 316 F.3d at 1328), demonstrates that no final agreement was made given the fact that one and all recognized that there was no contract, and Futures never submitted an invoice during supposed performance. Indeed, the negotiations over the text of the proposed contract that occurred after the November 27, 2012 meeting provide further evidence that there was never a meeting of the minds. Thus, Futures has never come close to proving that it met the elements of a contract which are required equally to find a contract implied-in-fact as one that is express.

---

[44] On occasion, Futures argues that the government had the "intent" to contract, therefore creating a contract (*e.g.*, app. br. at 24; 24 n.36; 24 n.37). But having the intent to make a contract in the future, which is really what the evidence demonstrates, is not the same as the present intent to make a particular, definite contract. *E.g., Modern Sys. Tech., Corp.. v United States*, 979 F.2d 200, 202 (Fed. Cir. 1992) (language "contemplative of future contract" that does not indicate "present intent that either party be bound" does not make a binding contract).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

IV. There was no Ratification – Institutional or Otherwise – of any
Unauthorized Contractual Commitments Made to Futures

Futures has argued that contracting officers and a constellation of high-ranking Army officials were aware of the Army's use of the H2H.com portal and effectively ratified the alleged implied-in-fact contract. Notably, Futures doesn't specify any conscious decision ratifying the agreement by any of the many persons in the know accomplished the ratification or what the exact terms of the agreement were that were so ratified. Instead, we get what is essentially a pointillist painting of the numerous high-level individuals who supposedly knew or should have known that services were being provided and collectively formed a basis for ratification (*see* app. br. at 5-21). Even if we were able to divine an agreement that meets all the requirements of a government contract except for the authority element which is the sole element that ratification can address – and to be crystal clear, we have made the point above that we do not – Futures has failed to prove ratification.

A. What Constitutes Ratification

Ratification is the means by which a contract made by one without authority to do so becomes authorized by one with proper authority. *HarbertLummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433 (Fed. Cir. 1998); *see also Schism v. United States*, 316 F.3d 1259, 1289 (Fed. Cir. 2002) (quoting Restatement (Second) of Agency § 82 (1958)) (general ratification, not limited to contract context). It does not change the elements of a contract; rather, it permits the authority element to be met after the fact. Moreover, the person with authority who ratifies the contract needs to have at least constructive knowledge of the terms agreed to. *Id.* As the Federal Circuit in *HarbertLummus* quoted the Supreme Court: "such ratification can only be based on full knowledge of all the facts upon which the unauthorized action was taken. This is as true in the case of the government as it is in that of an individual." *United States v. Beebe*, 180 U.S. 343, 354 (1901) (quoted in *HarbertLummus*, 142 F.3d at 1433). Additionally, "[r]atification must . . . be based on a demonstrated acceptance of the contract. Silence in and of itself is not sufficient to establish demonstrated acceptance of the contract by the [contracting officer]." *HarbertLummus*, 142 F.3d at 1434.

The Court of Claims and its successor, the Federal Circuit, have expanded the reach of ratification on the authority side by permitting institutional ratification by individuals who don't strictly possess contracting authority. *See, e.g., Silverman v. United States*, 679 F.2d 865 (Ct. Cl. 1982); *City of El Centro v. United States*, 922 F.2d 816 (Fed. Cir. 1990); *Janowsky v. United States*, 133 F.3d 888 (Fed. Cir. 1998). Although there may be some tension amongst these cases (*Janowsky* was arguably more expansive than *City of El Centro*, *see Engineering Solutions & Products, LLC*, ASBCA No. 58633, 17-1 BCA ¶ 36,822 at 179,468 (discussion)), none of them or

35

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

their progeny change the fact that, for a contract to be ratified, its terms must be understood by the parties.

### B. There is no Ratification by a Contracting Officer

There was no testimony or evidence submitted at the hearing that any contracting officer recognized and demonstrated acceptance of a previously-unauthorized contractual commitment and ratified it.  Futures does not argue that there was such evidence; rather, it asserts that multiple contracting officers had at least constructive knowledge of a contract which they ratified by silence at a time that the government was reaping the fruits thereof (app. br. at 13-20).  This is just not factually supported.

It is again helpful to consider the two major time periods before us:  first, the time from December 5, 2011 to November 27, 2012, when LTG Bromberg committed to making an effort to obtaining a contract for Futures; second, the period after the November 27, 2012 meeting during which LTG Bromberg directed COL Yost to make formal efforts to award a contract to Futures.

For the first time period, Futures acknowledged to LTG Bromberg that there was no separate contract outside of the Hooah and TASA contracts.  Moreover, as we discussed in the Facts section above, despite OSD-RA's initial concerns about allowing active duty access to the portal, ultimately, it was decided that, since Futures believed opening up the portal was in its own interests and the military certainly benefited, this would be allowed.  Thus, whatever knowledge (direct or constructive) any contracting officers may have had about benefits being provided by Futures to the government would have been seen through the prism that it was not being provided by separate contract but as being in its interests.  This is not knowledge that would support such a hypothetical contracting officer (Futures alleges there were four contracting officers with such knowledge) ratifying a contract.  Moreover, though Futures' brief cites testimony that contracting officers should have known of the work being performed by Futures and that it would be improper for the Army to accept it, it says nothing of the other terms of the contract that these contracting officers knew or should have known.  It is impossible for an individual to ratify a contract which has terms that the individual neither knows nor could have known.

For the job fair work being done in this same time period, the evidence is similar and leads to similar conclusions:  the Army internally concluded that Futures participated in these job fairs out of its own "hide."  A contracting officer cannot ratify a contract for work he or she believes to be outside of the realm of contracting.

With respect to the second time period, the notion of ratification by a contracting officer is even more farfetched.  It was plain to all that any contract award

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

was subject to going through the procedures which COL Yost was following. No contracting officer with knowledge of what was occurring would plausibly intend to shortcut the process, much less possess the authority to do so. Finally, Futures is wrong that silence by the contracting officers can constitute ratification.

### C. There is no Institutional Ratification

The same facts that preclude finding ratification by a contracting officer here also foreclose a finding of institutional ratification. Futures has provided no evidence that any of the high-ranking generals who supposedly accepted performance from Futures had anything more than partial knowledge of the facts (*see* app. br. at 6-12). The high-ranking individuals concerned with the first time period appeared to believe it was part and parcel with the OSD-RA Hooah and TASA contracts, while those involved in the second time period bemoaned the fact that they could not get the contract past the many hurdles in its way. None of these high-ranking officials purported to award a contract or authorize payment to Futures.

### V. "Fundamental Fairness" Does not Create a Government Contract Where There Never was one

Futures argues that when the government accepts services that are not paid for, "fundamental fairness" requires the creation of a government contract – essentially under the principle of *quantum meruit* (app. br. at 3-5; app. reply br. at 7-8; app. pretrial br. at 11-12). Though Futures may claim to have the equities on its side, this argument is premised upon a fundamental misreading of the applicable law.

Recovery under *quantum meruit* generally requires a contract implied-in-law. *Int'l Data Products Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). But we do not possess jurisdiction over such contracts. *City of El Centro*, 922 F.2d at 824 (citing cases); *see also Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,534 (citations omitted). The Federal Circuit, however, has seen fit to permit *quantum meruit* recovery in those cases in which the parties had an express contract which they performed but which was later set aside as being unlawful. In such instances, the court justified payment as being based on a contract implied-in-fact. *See Int'l Data Products Corp.,* 492 F.3d at 1325-26 (citing *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329-30 (Fed. Cir. 2006)); *United States v. Amdahl Corp.*, 786 F.2d 387 at 393 (Fed. Cir. 1986 ) (citing *Prestex, Inc. v. United States*, 320 F.2d 367, 373 (Ct. Cl. 1963)). What Futures does not (and cannot) cite is a case where there was never an express contract in the first place. Indeed, when a contract is "neither invalid nor unenforceable . . . the exception [allowing for recovery under *quantum meruit*] does not apply." *Int'l Data Products Corp.,* 492 F.3d at 1326.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Futures does argue that the government's affirmative defense of illegality somehow makes this case similar to *Int'l Data Products, Amdahl* and the rest, but that reflects a misunderstanding of the cases. In those cases, as we note above, the parties performed under a contract that later turned out to be illegal or otherwise unenforceable; here, the government's affirmative defense of illegality would only apply if we were to find there to be a contract in the first place, but, as we found above, there never was a contract. Put another way, the government's pleading an affirmative defense that is only applicable if Futures is found to have a contract does not grant Futures the right to a payment that it never would have otherwise been entitled to in the first place.

### VI. The "Unilateral Mistake" Argument Relies on Inapplicable Law

At the end of its reply brief, Futures reaches back to its motion for summary judgment to resurrect the argument that the Army is somehow responsible to pay for its services due to a unilateral mistake by certain high level officials. The supposed unilateral mistake was their belief that access to the H2H portal for active duty members was being provided under the authority of the Hooah and TASA contracts with OSD-RA. As Futures would have it, the burden of a government mistake must fall on the government, therefore it (Futures) is entitled to payment (app. reply br. at 15-17; *see also* app. amm. MSJ[45] at 19-23).

We have some difficulty knowing where to start with this argument. The authority cited by Futures was a *dissent* by Judge Newman at the Federal Circuit in a case in which an action by the contracting officer had been ruled unlawful and thus not binding (*see* app. amm. MSJ at 22 (citing *Johnson Mgmt. Grp. CFC v. Martinez*, 308 F.3d 1245, 1260 (Fed. Cir. 2002) (Newman dissenting))).[46] Moreover, the point the dissent was making was not, as Futures would have it, that in any case in which the government made a mistake as far as understanding the meaning of one contract, the contractor should be treated as if it had a different contract that was never agreed upon. Rather, citing *Amdahl*, the dissent was of the view that, if the government seeks to evade compliance with a contractual provision on the ground that the government mistakenly agreed to it though it was illegal, the government should bear some responsibility for its mistake. The circumstances in *Johnson Management* are not remotely like those presented here and, again, the authority that Futures is citing is a dissent. In any event, what hurt Futures here was not an attempt by the Army to invalidate a mutually agreed upon contract based on a mistaken belief held by some in the Army that the Hooah and TASA contracts provided services to the active duty

---

[45] Prior citation to Futures' "MSJ" were to its opening motion for summary judgment, submitted on September 29, 2020. "app. amm. MSJ" refers to its renewed motion for summary judgment, submitted on May 24, 2021.

[46] It is not appropriate to cite a dissent as governing authority.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

force – we have found that there was never a contract and the Army never sought to invalidate one; rather, what hurt Futures was its own decision to provide services to the active duty force in the absence of a contract specifically providing for it in the hopes that such a contract would be provided later. Whatever misapprehensions some Army officials may have held, they neither created nor affected any contractual rights held by Futures and provide no basis for remuneration here.

<u>CONCLUSION</u>

Futures provided access to the H2H.com portal to active duty service members at a time that it had no obligation to do so and to the benefit of the Army. Both the Army and Futures had future plans that would have made the provision of this service worth it to Futures, but those plans never came to fruition. This, unfortunately, sometimes happens in business, but it did not, in the case and facts before us, create a contract or some other means by which the Army would be obliged to pay Futures. The appeal is denied.

Dated: April 16, 2026

J. REID PROUTY
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>                                          I <u>concur</u>

MICHAEL N. O'CONNELL                    MARK A. MELNICK
Administrative Judge                            Administrative Judge
Vice Chairman                                     Armed Services Board
Armed Services Board                           of Contract Appeals
of Contract Appeals

39

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61566, Appeal of Futures, Inc., rendered in conformance with the Board's Charter.

Dated: April 16, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals